UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In Re: ) | |
| ) | |
| **SOMERVILLE BREWING COMPANY** ) | Chapter 11 |
| ) | Case No. 19-13300-FJB |
| **DEBTOR** ) | |
| ) | |

### ASSENTED TO MOTION FOR AN ORDER AUTHORIZING THE DEBTOR TO SELL PERSONAL PROPERTY AND EQUIPMENT FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AND TO USE INTERNET AUCTION MECHANISM

Somerville Brewing Company, the debtor and debtor-in-possession in the above-captioned case ("**Somerville Brewing** " or the "**Debtor**"), hereby respectfully requests that this Court enter an order authorizing the Debtor, pursuant to 11 U.S.C. § 363(b), (f) and (m), Fed. R. Bankr. P. 6004 and MLBR 6004-1, to sell, assign and transfer by public auction (the "**Public Auction**") the Debtor's right, title and interest in all of its personal property, and equipment (the "**Property**") free and clear of all liens, claims, interests, and encumbrances.(the "**Motion**")**.**

1.     The Public Auction will take place via on-line bidding due to the current limitations on physical distanceing and related restrictions at both of the locations operated by the Debtor which are at 15 Ward Street, Somerville, Massachusetts ("**Ward Street**") and 490 Foley Street, Somerville, MA 02145 ("**Assembly Row**") and online through the Internet Auction Mechanism as more thoroughly described in the *Motion of Debtor for Authority to Employ Auctioneer to Conduct Public Auction of Personalty Assets*, which Motion was approved on July 7, 2020 [Doc. No. 178].

2.     Subject to approval of this Motion, the Public Auction shall be conducted by the Debtor's auctioneer, Paul E. Saperstein Co., Inc. (the "**Auctioneer**") as follows:  Assembly Row on August 19, 2020 at 11:00 a.m. and Ward Street on August 20, 2020 at 11:00 a.m.

3.     The sale of the Property shall be free and clear of all liens, claims, interests and encumbrances, with any such liens, claims, interests and encumbrances in the Property attaching to the proceeds to the same extent, and in the same order of priority as such liens, claims, interests and encumbrances were valid, perfected, and enforceable against the Property as of Petition Date. As set forth herein and in the proposed order allowing this Motion, the Debtor proposes that certain proceeds be paid to the Debtor's purchase money secured lenders and the remainder of which shall first be paid to the creditors holding security interests in the remaining assets in the order of priority set forth in Paragraph 21 below. To the extent there is any ambiguity as to the rights to the sale proceeds, those sums shall be placed in a segregated account until further order of the Court. In further support of this Motion, the Debtor states as follows:

### A. JURISDICTION

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5. The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105(a) and 363, as well as Fed. R. Bankr. P. 6004 and MLBR 6004-1(b).

### B. BACKGROUND

6. On September 27, 2019 (the "**Petition Date**"), the Debtor filed a voluntary petition in this Court under Chapter 11 of Title 11 of the United States Code (as amended, the "**Bankruptcy Code**"). The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

7. The Debtor is a Delaware corporation organized on or about January 10, 2011 and registered to do business in Massachusetts on March 30, 2011.

8. Until the closure of the locations due to the Covid-19 virus and the related "stay at home orders", the Debtor operated in two locations, a brewery and tap room at 15 Ward Street, Somerville. Massachusetts ("Ward Street") and a brewery and full-service restaurant located in Assembly Row, Somerville, Massachusetts ("Assembly Row").

9. On November 11, 2019, the Debtor filed an Application to Employ Business Broker [Doc. No. 69] and an Order entered authorizing their employment to sell the respective location including the assets contained therein. No offers were received through the business broker and it was determined to sell the personal property of the Debtor through public auction.

10. On July 7, 2020, the Order entered approving the Debtor's Application to employ Paul E. Saperstein Company as the Auctioneer ("**Auctioneer**" or "**PESCO**") for the purpose of conducting a public auction of the personal property of the Debtor [Doc. No. 208].

11. The Auctioneer will arrange to have the auction advertised in local, regional, and national publications, will arrange for the posting of the sale on the internet, and the transmission of notices of the auction to all parties who the Debtor or the Auctioneer regard as potential bidders. Additionally, the Auctioneer shall promote the auction through direct marketing methods, including email marketing directed to potential bidders in the database developed by the Auctioneer.

    **C.**    **PUBLIC AUCTION SALE RATHER THAN PRIVATE SALE**

12.    The Debtor asserts that a Public Auction sale rather than a private sale is in the best interest of the Estate as the Debtor has sought to sell the assets at private sale since on or about November 2019 but has not, to date, received an offer to acquire one or both of the Debtor's locations.

13.    Due to the COVID-19 closures and "stay at home orders" the ability of the Debtor to continue operations has been deemed impossible and the locations shall not reopen or conduct its business operations going forward.

14.    The only offer received for purchase by private sale was the offer by Street Retail, Inc. for certain of the assets located at the Assembly Row location and the Debtor requires the sale of all assets so as to maximize the sale of assets for payment to creditors in accordance with their claims and priority.

    **D.**    **THE PROPERTY SUBJECT TO SALE**

15.    The Property to be sold at the Public Auction is all of the personal property of the Debtor at both of the respective locations. The equipment to be sold is identified on the Debtor's Schedules at parts 7 and 8 filed October 30, 2019. [Doc. No. 50].

    **E.**    **STALKING HORSE BID FOR ASSETS LOCATED AT ASSEMBLY ROW BUT EXCLUDING THE DEBTOR'S RIGHTS IN ANY LEASES OR EXECUTORY CONTRACTS**

16.    The Debtor has received and accepted an Offer for the purchase of certain assets located at the Assembly Row location (the "**Offer**" or "**Stalking Horse Bid**") from Street Retail, Inc., the landlord for the premises (the "**Stalking Horse Bidder**"). The Offer by Street Retail, Inc. is as follows:

> "[O]ur client (Street Retail, Inc.) has authorized us to offer **$85,000**, plus a release of claims against the bankruptcy estate, in exchange for all of the equipment and personal property located at the Assembly Row premises when our client inspected the same on May 19, 2020, plus a release of any claims the estate may have against Street Retail.
>
> Of course, this assumes that the sale will be under section 363 of the bankruptcy code, such that title will pass free and clear of all liens and encumbrances; the lease will be rejected and Street Retail will have possession of the Assembly row premises….
>
> **For clarity, Street Retail is <u>not</u> purchasing any of the debtor's rights in any leases or executory contracts.**
>
> This offer is made with the intent to be bound."

(Emphasis added)

17.     Specifically excluded from the Offer to purchase from the Stalking Horse Bidder are the leased equipment and executory contracts which are detailed as follows (together, the "**Assembly Row Leased Equipment**"):

    a.     <u>M2 Lease Funds, LLC</u>: Equipment subject to the leases consists of the R5.5i TAS 7.5 HP Compressor, MA Pedestals for Compressor, Restaurant equipment as stated on order acknowledgement from Pioneer Sales Company, Weber Can Printer, 82 MEK US Power, Ink MEK Black, 5 Bottles/Case. Makeup, MED, 5 Bottles /Case, Bottle, Wash MEK, Beaker, Wash, Photocell, Laser Kit, Stand, Stainless Steel Weber, Mount, Printhead Floor as stated on invoice from Weber Labels & Labeling Systems, WGC-250 Canning System, Depal-Pneu Assist DEPAL-PA, Brewery Chiller and Pilot Pro Electric Base and Wild Goose Can Depaletizer.

    b.     <u>Financial Pacific Leasing, Inc</u>. Equipment subject to a lease: (3) 5bbl Brite Tank, (3) 3.5bbl Brite, (3) 3.5 Fermenter, Gillette Restaurant Equipment and 1 Norlake 8' x 10' x 7.7' tall walk in cooler w/indoor remote left hand hinged door compressor.

18.     At the Public Auction, all interested parties shall be entitled to bid on the equipment and personal property located at the Assembly Row premises **INCLUDING BUT NOT LIMITED TO THE ASSETS WHICH ARE THE SUBJECT OF THE STALKING HORSE BID AND THE DEBTOR'S RIGHTS IN THE ASSEMBLY ROW LEASED EQUIPMENT,** all other terms and conditions, except as to price shall be unchanged.

19.     Upon conclusion of the Public Auction sale at Assembly Row, the Stalking Horse Bidder shall be entitled to increase the amount of its Stalking Horse Bid of $85,000.00 to not less than 5% in excess of the highest bid received for the entirety of the assets at the Assembly Row location to wit, to increase their bid to *include or exclude* the assets which are the subject of the Stalking Horse Bid as well as the Assembly Row Lease Equipment.

20.     The Debtor shall sell the assets which are the subject of the Stalking Horse Bid and the assets which are the subject of leases or executory contracts in separate sale lots with all liens, claims and encumbrances attaching to the sale proceeds of the respective assets as sold, in the order of their priority.

    E.     SECURED AND/OR LEASE CLAIMS ASSERTED

21.     Multiple creditors assert all asset blanket security interests in the Property subject to this Motion (the "**All Asset Secured Claims**"), in order of priority:

    a.     First, <u>Cambridge Trust Company ("**CTC**") (Proof of Claim #21)</u> The Debtor executed and entered into, among others, the following instruments and agreements with CTC: (i) a certain Term Note dated September 24, 2014, in the original principal amount of Forty Thousand and 00/100 ($40,000.00) Dollars, from the Debtor in favor of CTC ("<u>Term Note A</u>"), (ii) a certain Term Note dated October 7, 2014, in the original principal amount of Eighty Thousand and 00/100 ($80,000.00) Dollars, from the Debtor in favor of CTC ("<u>Term Note B</u>"), (iii) a certain Term Note dated September 3, 2014, in the original

principal amount of Three Hundred Thirty Thousand and 00/100 ($330,000.00) Dollars, from the Debtor in favor of CTC ("Term Note C"), (iv) a certain Demand Grid Note dated April 28, 2014, in the maximum principal amount of Fifty Thousand and 00/100 ($50,000.00) Dollars, from the Debtor in favor of CTC (the "Demand Note", collectively with Term Note A, Term Note B and Term Note C, the "CTC Notes"), (v) a certain Security Agreement dated April 28, 2014, from the Debtor in favor of CTC (the "CTC Security Agreement"), (vi) a Uniform Commercial Code Financing Statement Form UCC-1 filed with the Secretary of State, Dover, Delaware, on April 29, 2014 as Instrument No. 20141677681 (the "CTC UCC", together with the Notes, the Security Agreement and all other instruments, certificates and filings used in connection therewith, as the same may be amended from time to time, are hereinafter referred to collectively as the "CTC Loan Documents"). Pursuant to the above described CTC Loan Documents, the Debtor granted CTC a security interest in all of the Debtor's assets, including, without limitation, all of its accounts, accounts receivable, contract rights, chattel paper, inventory, equipment, machinery, furniture, trade fixtures, general intangibles, tax refunds, documents, instruments, books and records, deposit accounts and investment property and products and proceeds thereof (the "CTC Collateral"). CTC asserts and the Debtor does not dispute that, as of the Petition Date, CTC holds a perfected first priority security interest (the "CTC Pre-Petition Liens") in all of the CTC Collateral, and properly perfected purchase money security interests, if any, in equipment of the Debtor.

CTC asserts and the Debtor does not dispute that, as of the Petition Date, the following amounts, exclusive of attorneys' fees and costs of collection, (collectively, the "CTC Obligations") were owed to CTC under the Loan Documents and were and are secured by the CTC Pre-Petition Liens:

| **Facility** | **Outstanding Principal** | **Outstanding Interest** | **Estimated Per Diem** |
|---|---|---|---|
| Term Note A | $7,064.00 | $2.55 | $1.28 |
| Term Note B | $28,178.00 | $86.49 | $5.09 |
| Term Note C | $130,849.00 | $681.50 | $21.91 |
| Demand Note | $15,278.00 | $94.75 | $2.94 |
| **Total** | **$181,369.00** | **$865.20** | **$31.22** |

b.       Second, Massachusetts Growth Capital Corporation ("**MGCC**")(Proof of Claim # 24). The Debtor has executed and entered into, among others, the following instruments and agreements with MGCC: (i) a Secured Term Note in the stated amount of $464,874.85, dated May 1, 2018, in favor of MGCC; (ii) a Loan and Security Agreement, dated June 29, 2016, in favor of MGCC; (iii) an Amendment to Loan and Security Agreement, dated May 1, 2018, in favor of MGCC; and (iv) a UCC-1 financing statement describing Somerville

pg. 5

Brewing Company, as Debtor, and MGCC, as secured party, and filed with the Delaware Department of State on June 30, 2016. Pursuant to the above described Loan and Security Agreement, Section 2.1, the Debtor granted MGCC a security interest in all of the Debtor's assets, including, without limitation, all of its accounts, accounts receivable, contract rights, chattel paper, inventory, equipment, machinery, furniture, trade fixtures, general intangibles, tax refunds, documents, instruments, books and records, deposit accounts and investment property and products and proceeds thereof (the "MGCC Collateral").

MGCC asserts and the Debtor does not dispute that, as of the Petition Date, MGCC holds a perfected second priority security interest (the "MGCC Pre-Petition Liens") in all of the MGCC Collateral, subject only to a first priority security interest held by CTC and properly perfected purchase money security interests, if any, in equipment of the Debtor. MGCC asserts that, as of November 1, 2019, the following amounts, exclusive of attorneys' fees and costs of collection, (collectively, the "MGCC Obligations") were owed to MGCC under the Loan Documents and were and are secured by the MGCC Pre-Petition Liens:

| | |
|---|---|
| Principal: | $464,874.85 |
| Interest (Sept. & Oct 2019): | $ 7,960.18 |
| Total: | $472,835.03 |
| Per Diem: | $ 127.36 |

c.  Third, Federal Realty Investment Trust. ("FRIT"). FRIT filed a UCC-1 Financing Statement on November 29, 2017 with the Delaware Secretary of State and recorded a Leasehold Mortgage Deed and Security Agreement and UCC-1 Fixture Filing for the Assembly Row location at the Middlesex South Registry of Deeds on December 12, 2017 at Book 70370, Page 219. No Proof of Claim was filed with regard to this alleged obligation in the sum of approximately $391,672.32. However, the Proof of Claim filed by Street Retail Inc. (Proof of Claim # 28) asserted only a secured claim for the security deposit in the amount of $19,310.59.

d.  Fourth, On Deck Capital Inc. (Proof of Claim # 2 and #3) asserts two liens on all of the assets of the Debtor as evidenced by (i) a Term Note dated May 18, 2018 with an outstanding balance of $76,638.42 and (ii) a Line of Credit dated March 29, 2019 which sum is outstanding in the amount of $48,504.78.[1] A UCC-1 Financing Statement was filed on November 6, 2018 for the Term Note. There is no UCC-1 Financing with regard to the Line of Credit filed.

e.  Fifth, Commonwealth of Massachusetts, Department of Unemployment Assistance. ("DUA"). The DUA filed a Notice of Lien December 24, 2018 for the sum $6,690.86.

f.  Sixth, American Express National Bank ("AMX")(Proof of Claim #9) asserts a lien on all assets of the Debtor and recorded a UCC-1 Financing Statement on April 22, 2019 on all assets of the Debtor to secure an obligation outstanding in the sum of $ 23,493.62.

---

[1] The Debtor's Schedules refer to Financial Agent Services as the holder of these claims.

22. Further, multiple creditors assert a security interest on, or other property interests in certain discretely identified Property subject to this Motion (the "**Discrete Collateral**"), specifically:

a. <u>Financial Pacific Leasing, Inc</u>. (Proof of Claim #4) holds a claim pursuant to an equipment lease agreement for the equipment described as (3) 5bbl Brite Tank, (3) 3.5bbl Brite, (3) 3.5 Fermenter, Gillette Restaurant Equipment and 1 Norlake 8' x 10' x 7.7' tall walk in cooler w/indoor remote left hand hinged door compressor in the amount of $39,365.89 as evidenced by an equipment lease agreement and the UCC-1 Financing Statement filed on June 14, 2017.

b. <u>Crestmark Vendor Finance, a division of MetaBank</u> (Proof of Claim #13) holds an equipment finance agreement and security interest on the Franke Beer Kegs as of the Petition Date of $130,713.00. A UCC-1 Financing Statement was filed on February 6, 2019.

c. <u>Corporation Service Company as Representative of Ascentium</u> holds a claim secured by the Grace Material Mezzanine, 2 office platforms, 1 tank platform, the 55 Gallon Glycol Drum and Refractometer. A UCC -1 for the equipment was filed on October 10, 2014. In addition, CT Corporation System as Representative of Ascentium Capital holds a claim secured by the Wild Goose WGC-250 canning line (4 Auto Fill Heads), Auto Lid Drop, Auto Steamer, WGC Rinse Tunnel/Air Nozzle, Inlet Pressure/Temperature Monitoring with Multiport Liquid Infeed Manifold. A UCC-1 Financing Statement was filed on April 11, 2016. Upon information obtained, the sum outstanding is approximately $79,348.00 as set forth in the bankruptcy schedules filed by the Debtor. No Proof of Claim was filed.

d. <u>M2 Lease Funds, LLC</u> has two (2) leases for equipment which are described as follows:

(i) <u>Lease dated November 17, 2016</u>: R5.5i TAS 7.5 HP Compressor, MA Pedestals for Compressor, Restaurant equipment as stated on order acknowledgement from Pioneer Sales Company, Weber Can Printer, 82 MEK US Power, Ink MEK Black, 5 Bottles/Case. Makeup, MED, 5 Bottles /Case, Bottle, Wash MEK, Beaker, Wash, Photocell, Laser Kit, Stand, Stainless Steel Weber, Mount, Printhead Floor as stated on invoice from Weber Labels & Labeling Systems, WGC-250 Canning System, Depal-Pneu Assist DEPAL-PA. Upon information obtained, the sums outstanding is approximately $17,995.67 as set forth in the bankruptcy schedules filed by the Debtor. No Proof of Claim was filed.

(ii) <u>Lease dated April 4, 2017</u>: Brewery Chiller and Pilot Pro Electric Base, Wild Goose Can Depaletizer. Upon information obtained, the sums outstanding is approximately $11,472.02. as set forth in the bankruptcy schedules filed by the Debtor. No Proof of Claim was filed.

  e. <u>Marlin Business Bank</u>: is scheduled on Schedule D of the Debtor's bankruptcy schedules due to a lapsed UCC-1 financing statement dated December 24, 2014 in connection with certain Kitchen Taproom Equipment, Manitowoc Ice Machine, Ice Bin, Bin Adapter, Sandwich Unit, Convection Hi Speed Oven, Refrigerator, UC Reach in Ref 27" Undercounter, Undercounter Freezer and Stacking Collar. No Proof of Claim was filed, and the Debtor believes no sums remain due.

23. To the best of Debtor's knowledge, except as set forth above, no other entity claims an interest in the Property.

**G. Basis for Relief Requested**

24. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In accordance with MLBR 6004(f)(1), sales of property outside the ordinary course may be by private sale or public auction.

25. Pursuant to Section 363(f) of the Bankruptcy Code, the Debtor may sell property free and clear of liens, claims and encumbrances if one of the following conditions is satisfied:

  a. applicable non-bankruptcy law permits the sale of such property free and clear of such interest;
  b. the lienholder or claimholder consents;
  c. such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
  d. such interest is in a bona fide dispute; or
  e. the lienholder or claimholder could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

The Debtor asserts that the proposed sale satisfies the above noted conditions.

26. The sale of the Property is in the best interest of the Debtor's estate as it will result in the disposition of assets as the Debtor is no longer operating at either location.

27. The Debtor believes that one or more of the above noted creditors have claims pursuant to leases or purchase money security interests each of which are secured by perfected liens and that upon sale, the sums shall be paid to the claimants in accordance with their priority.

28. CTC and MGCC have consented to the sale of the Property on the terms set forth in this Motion and agree that to the extent any valid, perfected liens, claims, interests or encumbrances existed as to the personalty of the Debtor on the Petition Date, those liens, claims, interests and encumbrances shall attach to the sale proceeds to the same extent, and in the same order and priority as of the Petition Date. Any monies that may be due and owing regarding any such liens will not be the responsibility of the successful purchaser.

29. Street Retail, Inc. has made an Offer for all assets which are located at the Assembly Square location so long as "*…the sale will be under section 363 of the bankruptcy code, such that title will pass free and clear of all liens and encumbrances; the lease will be rejected and Street Retail will have possession of the Assembly row premises….*". The Debtor will reject the lease and surrender possession of the Assembly Row premises no more than three (3) weeks following the removal of the assets at the conclusion of the sale.

30. In order to determine the value of the secured claims asserted against the Discrete Collateral pursuant to 11 U.S.C. § 506(a), each item of the Discrete Collateral shall be sold in a discrete and separate lot.

31. All proceeds from the sale of the Property, including the proceeds from the sale of the Discrete Collateral shall be held in escrow by Counsel to the Debtor in the Parker & Lipton IOLTA account until further order of the Bankruptcy Court, as described in more detail in Section K below.

32. Subject to the procedures as described in more detail in H and I set forth below, the proceeds from the sale of other Property, shall be paid to the holders of in accordance with the priorities set forth in Paragraph 21 above.

33. For all of the above reasons, the proposed Public Auction of the Property satisfies the requirements of both 11 U.S.C. § 363(f)(2) and (4), and the Property may be sold free and clear of liens, interests, and encumbrances.

    **H.**    **REPORT ON AUCTION RESULTS AND PROPOSED DISTRIBUTION**

34. Within ten (10) business days of receipt of the report from the Auctioneer on the outcome of the Auction and the invoice from the Auctioneer, the Debtor shall submit a Report of Auction Outcome ("**Report**") and a Motion to Approve the Proposed Distribution of Sale Proceeds ("**Motion to Disburse**") and an Application for Compensation on behalf of the Auctioneer ("**Application for Compensation of Auctioneer**"). The Report will detail the sums generated from the sale; the Motion to Disburse shall set forth the proposed distribution of the sale proceeds after payment of the sums to the Auctioneer in accordance with the Application for Compensation and apportioned as to the respective interest holders.

35. The Debtor serve copies of the Report, Motion to Disburse and Application for Compensation upon the following parties: (a) the U.S. Trustee, (b) all parties that, as of the filing of this Motion, have requested notice in this chapter 11 case pursuant to Bankruptcy Rule 2002 and (c) all parties with asserted interests in the Property.

    **I.**    **PAYMENT OF AUCTIONEER COMPENSATION AND REIMBURSEMENT OF EXPENSES**

36. The amount of the Auctioneer's compensation will be in accordance with MLBR 6004-1 (i.e. compensation will not exceed ten percent (10%) of the first $100,000 realized from the sale, four percent (4%) of the next $400,000, and three percent (3%) of the balance.)

37. In addition, the Auctioneer will incur labor charges in connection with (a) organizing the Property for sale at the respective locations in a manner that will most conducive to a public auction and that will generate the highest and best possible price; (b) conducting the auction sales and (c) attending to removal of the Property from the locations once the sales are completed. The nature of the property being sold presents unique challenges for removal and the Auctioneer is therefore uncertain exactly how much of the Property will be sold.

38. The Auctioneer estimates that labor costs should not exceed $8,500.00 which is based on 30 person days at $250.00 per day. The auctioneer cannot presently estimate the amount of the labor charges and will submit appropriate documentation should the expenses be necessary. Expenses for advertising will not to exceed $6,000.00. These terms are consistent with the compensation provisions of MLBR 6004-1.

J. **INTERNET AUCTION MECHANISM**

39. The Auctioneer anticipates incurring expenses for utilizing the services of Bidspotter.com, an internet company, so that the assets may be listed for sale on the internet simultaneously with the live auction sale at the Assembly Row and Ward Street location. The URL for the internet auction mechanism will be www.bidspotter.com. The fees and expenses associated with the internet auction component of the proposed public auction sale will be as follows (1) an event fee of $400.00 per location ($800.00) for the Auction paid by the bankruptcy estate; (2) a managerial fee paid by successful bidders to Bidspotter of four percent (4%) of the purchase price for any asset purchased through the online service, and (3) a fee of 4% paid by successful bidders for any bid paid by credit card. Payment through the internet auction mechanism shall be made to PESCO who will then remit payment and an accounting of sale proceeds, less applicable fees and expenses as described above, to Bidspotter. The Debtor is advised by the Auctioneer that complimenting the auction sale with an internet sales mechanism will improve the sales price generated for the Property.

40. To the best knowledge of the Debtor, the Internet Auction Mechanism will not provide auction services or any other services beyond access to its automated on-line services and related customer support.

K. **PUBLIC AUCTION PROCEDURES**

41. The Debtor requests approval of the following procedures in connection with the Public Auction of the Property:

   a. The Property shall be transferred on an "as is, where is" basis, without any representation or warranty of any kind by the Debtor or the Auctioneer.
   b. Pursuant to section 363(f) of the Bankruptcy Code, the Property shall be sold free and clear of any liens, claims, encumbrances and interests, with such liens, claims, encumbrances and interests, if any, attaching to the proceeds of such sale to the same extent, and in the same order of priority as those liens, claims, interests and encumbrances were valid, perfected, and enforceable against the Property on the Petition Date.

    c. The successful bidder for any of the Property being sold (including any party asserting a security interest in the Property) shall tender to the Debtor a deposit on the day of the auction equal to twenty five percent (25%) of its bid for the purchased Property.

    d. There shall be no credit bidding permitted due to the potential for multiple claims asserted as to certain of the Property.

    e. A successful bidder shall pay the balance of the purchase price by wire transfer or endorsed bank or certified check to the Auctioneer in accordance with the terms announced at the Public Auction, and in all events prior to the removal of any purchased Property.

    f. The Stalking Horse Bidder shall be entitled to the opportunity to advance an overbid at the conclusion of the auction for the entirety of the assets located at Assembly Row, including the sums bid for the Assembly Row Leased Equipment, so long as the minimum increase is not less than five percent (5%) of the highest offer(s) received.

    g. The Auctioneer shall offer for sale in separate lots the Discrete Collateral as set forth in Paragraph 22.

    h. The terms for the removal of the Property by the successful bidder shall be announced at the auction. The successful bidder must comply with the announced terms for removal or shall forfeit the deposit and the right to purchase the Property.

    i. To the extent that the Debtor does not consummate a sale to highest bidder for any Property for any reason, the Debtor, in its discretion, may sell such Property to the next highest bidder for the Property that shall successfully tender the required deposit to the Debtor within three (3) business days of written notice of default of the previous highest bidder without further Court order.

    j. The Debtor may, at or before the sale, impose such other and additional terms and conditions as they determine to be in the best interests of the Debtor and its estate, creditors, and other parties in interest.

    k. Additional terms may be announced by the Auctioneer at the time of the sale.

    l. The Court may modify the method of sale set forth herein at or prior to the hearing on the sale.

**L. PAYMENT OF PROCEEDS FROM SALE OF COLLATERAL**

42. Absent opposition to the Motion to Disburse and upon entry of a final Order approved by the Court setting forth payment to the respective parties asserting claims on the proceeds from the sale of the Property including the Discrete Collateral, the proceeds from the sale, net of the proportionate share of the Auctioneer's fees and expenses shall be distributed as set forth in the Order approving the Motion to Disburse.

43. In the event of dispute in some, but not all of the sale proceeds, the Debtor shall disburse those sums which are not disputed and as authorized by the Motion to Disburse within five (5) business days following entry of a final order on the Motion to Disburse as to the payment of undisputed sale proceeds. The Debtor shall hold the disputed sums in the Parker & Lipton IOLTA account pending a determination of a Complaint for Interpleader and Declaratory Relief ("**Complaint**") if required. The Complaint shall be filed within ten (10) business days following entry of a final Order in connection with the Motion to Disburse or such further Order of the Bankruptcy Court.

44. Within five (5) business days following entry of a final order and determination of any Complaint as to the claimant(s) entitled to payment from the proceeds realized from the sale of the Property the sale proceeds shall be distributed.

45. Within ten (10) business days following distribution, a Report of the Distribution shall be filed with the Bankruptcy Court.

46. The Debtor submits that the sale procedures and payment procedures are warranted under the circumstances and should be approved.

**L.    NOTICE**

47. The Debtor has served copies of this Motion on the following parties: (a) the U.S. Trustee, (b) all parties that, as of the filing of this Motion, have requested notice in this Chapter 11 case pursuant to Bankruptcy Rule 2002 and (c) all parties with asserted interests in the Property. The Debtor submits that in light of the nature of the relief requested, no other or further notice is required.

48. The Debtor proposes to serve the Notice of Public Sale (in the form attached as **Exhibit A** hereto) on all creditors, potential purchasers, and parties-in-interest. In addition, the Auctioneer will advertise the Public Auction.

**WHEREFORE**, the Debtor requests that the Court enter an Order:

1. Authorizing the Debtor to sell the Property by Public Auction free and clear of all liens, claims, interests, and encumbrances with any such liens, claims, interests, and encumbrances attaching to the proceeds of the sale to the same extent, and in the same order of priority as those liens, claims, interests and encumbrances were valid, perfected, and enforceable against the Property on the Petition Date;

2. Authorizing the Stalking Horse Bidder to submit an overbid on the sum(s) bid at the Assembly Row location in the entirety for the property that is subject to the Stalking Horse Bid, inclusive or exclusive of the Assembly Row Leased Equipment, in an amount not less than 5% of the final and total sum of sale prices bid at the Public Auction for the property that is subject to the Stalking Horse Bid;

3. Authorizing and directing Counsel to the Debtor to hold the proceeds from the Auction in escrow in the Parker & Lipton IOLTA account until the respective claims to the sale proceeds are determined upon entry of a final order in connection with the Motion to Disburse and/or upon entry of final judgment determining the rights to the sale proceeds which may be subject to a Complaint;

4. Authorizing and directing the Debtor to tender the proceeds from the sale accordance with the Motion to Disburse and/or Judgement on the the Complaint within five (5) business days of the entry of such Order and/or Judgement; and

5. Granting such other relief as is just and proper.

        Respectfully submitted,
        Somerville Brewing Company,
        By its attorney,

/s/ Nina M. Parker
Nina M. Parker (BBO #389990)
Marques C. Lipton (BBO #676087)
Parker & Lipton
Parker & Associates LLC
10 Converse Place, Suite 201
Winchester, MA 01890
(781)729-0005
nparker@parkerlipton.com

Agreed and Assented to by:

/s/ Rion M. Vaughan
Rion M. Vaughan, Esq., Counsel to Cambridge Trust Company

/s/ James M. Liston
James M. Liston, Esq., Counsel to Massachusetts Growth Capital Corporation